UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

SAMUEL WHITLOW,                              )
              Plaintiff,                  )
                                       )
       vs.                                    )          1:07-cv-1173-WTL-TAB
                                       )
MICHAEL J. ASTRUE, Commissioner of the      )
Social Security Administration,             )
              Defendant.                  )

**ENTRY ON JUDICIAL REVIEW**

      Plaintiff, Samuel Whitlow ("Whitlow"), brings this action seeking judicial review of the final decision of Defendant, Michael J. Astrue, Commissioner of the Social Security Administration ("the Commissioner"), denying Whitlow's applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI").  In his application, Whitlow alleged that he became disabled on October 1, 2004, due to a nervous condition and an arthritic back.  An Administrative Law Judge ("ALJ") held a hearing on December 7, 2006, and determined that Whitlow was not disabled. Specifically, the ALJ found that Whitlow retained the ability to perform a range of light work if he stopped his drug and alcohol abuse.  *See* 42 U.S.C. §§ 423(d)(2)(C) and 1382c(a)(3)(J) (providing that a person shall not be considered disabled if alcoholism or drug addiction would be contributing factor to finding of disability).  As explained in detail below, the Court **AFFIRMS** the ALJ's denial of benefits.

# I. **BACKGROUND**

## A. PERSONAL HISTORY

Whitlow was born on February 19, 1960.  R. at 84.  He was forty-four years old at the time of the alleged onset date of his disability, and he was forty-seven at the time of the ALJ's decision. R. at 16-31, 84, 165.  Whitlow has an eight or ninth grade level of education and contends that he had taken special education classes while in school.  R. at 22, 29, 170.  He has previously worked as a prep cook from 1980 to 1993.  R. at 166.

Whitlow previously received disability benefit based on a 1993 DIB application and a 1996 SSI application.  R. at 16.  Those benefits were terminated in October 2004 and April 2005, respectively, based on medical cessation.  *Id.*  Apparently, the specific reason was due to Whitlow's failure to make a scheduled medical appointment.  R. at 86, 388.  The ALJ, concluding that there was an absence of good cause, denied Whitlow's timely request for reopening the prior cessation. R. at 16.

Whitlow has a lengthy history of alcohol and drug dependence.  R. at 54, 87, 291, 293, 327. Further, he served time in prison from 1993 through 1996 for attempted murder after pouring gasoline on himself and mother and unsuccessfully trying to start a fire.  R. at 82, 392.  Whitlow has been homeless since 2002 but has found other people to stay with from time to time.  R. at 82, 86, 88, 93, 172, 191.

## B. MEDICAL HISTORY

The earliest records in the record of proceedings reveal that Whitlow received mental health treatment at Gallhue Mental Health Center in 1993.  R. at 49-75.  Those records reveal a diagnoses

of alcohol dependence, schizophrenia, and antisocial personality disorder, as well as a history of temper outbursts. *Id.* On August 18, 2004, he went to the emergency room at Wishard Memorial Hospital ("Wishard") after having a nervous breakdown. R. at 226, 287. A mental status examination performed by Dr. Ryan Martin ("Dr. Ryan") indicates that Whitlow's appearance and affect were appropriate, that he was cooperative, that his concentration was not impaired, and that his judgment was appropriate. R. at 228-30. However, Whitlow reported hallucinations and was depressed, and Dr. Ryan concluded that Whitlow's intellectual functioning was below average. *Id.*

In July 2005, Whitlow began services for depression, his temper, housing, and employment at Midtown Community Health Center ("Midtown"). R. at 252-55. On July 12, 2005, Whitlow complained about hallucinations and thoughts of harming himself and others. R. at 79. At that time, he also reported high levels of alcohol consumption and cocaine use. *Id.* Whitlow was ultimately diagnosed with alcohol dependence, cocaine abuse, schizoaffective disorder, personality disorder not otherwise specified, and mild mental retardation. R. at 81. That same day, Dr. Martin performed another mental status examination and observed that Whitlow was disheveled, had a sad affect, was anxious, and had slurred speech. R. at 231-33. In addition, Dr. Martin found Whitlow to be cooperative with logical and relevant thought process, alert, and oriented. *Id.* However, Dr. Martin also noted that Whitlow reported hallucinations and concluded that Whitlow's intellectual functioning was below average, that his concentration was mildly impaired, and that his judgment was impulsive. *Id.* Whitlow was released shortly thereafter on July 16, 2005. R. at 81. At that time, because Whitlow claimed that he had no intention of stopping his alcohol or cocaine use, the doctor recommended that he cease taking his medications. *Id.* He returned to Midtown two days

3

later indicating that he had used cocaine and that he wanted mental health treatment and counseling for anger problems.  R. at 294.

Thereafter, on September 19, 2005, Whitlow reported that he had not had cocaine for one year but that he drank excessive amounts of alcohol one to two times per month.  R. at 86.  Whitlow refused addiction treatment at that time.  *Id.*  He was diagnosed with schizophrenia, intermittent explosive disorder, alcohol dependence, and mild mental retardation.  *Id.*  Whitlow's mental status examination at that time indicates that he was cooperative but had inappropriate smiling, slow speech, irritable mood, paranoid thought content, mildly impaired concentration, and impulsive and questionable judgment.  R. at 243-45.

Whitlow then underwent a consultative physical examination on September 24, 2005, at the request of the state agency.  R. at 280-83.  Whitlow arrived at the appointment with a cane and complained of low back pain, degenerative joint disease, asthma, and alcohol abuse.  *Id.*  He reported that he could not lift more than five pounds in either hand, stand for more than fifteen minutes, or walk more than two blocks at a time.  *Id.*  Whitlow was diagnosed with asthma, degenerative joint disease, and possible peripheral neuropathy.  *Id.*  The doctor who examined Whitlow noted that Whitlow had no visual or speech limitations and that there was no clinical evidence of mental impairment, memory problems, depression, or anxiety disorder.  *Id.*

Whitlow's record was subsequently reviewed on October 6, 2005, by state agency doctor M. Ruiz for an opinion on Whitlow's physical abilities for work.  R. at 271-79.  Dr. Ruiz noted Whitlow's diagnoses of degenerative joint disease and back pain and opined that Whitlow could perform light work, occasionally lift twenty pounds and frequently lift ten pounds, stand/walk for

six hours and sit for about six hours in an eight-hour day, and occasionally perform postural activities.  *Id.*

The next day, October 7, 2005, Whitlow met with a nurse at Midtown and denied any current suicidal or homicidal ideations or hallucinations.  R. at 88.  He reported that his mood was "alright" and that medication helped him to sleep.  *Id.*   About three weeks later, on October 24, 2005, Whitlow participated in a psychological evaluation with Dr. Jerome Modlik ("Dr. Modlik") at the request fo the state agency.  R. at 263-69.  Dr. Modlik observed that Whitlow's grooming and hygiene appeared "quite good," that his eye contact was direct and appropriate, that his speech was fluent, that he had no psychomotor manifestations of excessive anxiety, and that he was generally cooperative.  *Id.*  Dr. Modlik noted that Whitlow's reports of substance abuse were inconsistent with other documentation, which suggested that Whitlow had been using alcohol and drugs more recently than Whitlow claimed.  *Id.*   As for Whitlow's cognitive functioning, Dr. Modlik reported that Whitlow was oriented, repeated five digits forward and four digits backward, recalled three of four objects after immediate delay and all objects after ten minutes, and could recite the alphabet and perform counting exercises without error.  *Id.*  Dr. Modlik reported Whitlow's scores on the Wechsler Adult Intelligence Scale-III, noting a verbal score of 70, a performance score of 79, and a full scale score of 72.  *Id.*  These scores were in the borderline range.  *Id.*  Dr. Modlik also remarked that Whitlow's fund of knowledge was "surprisingly strong."  *Id.*

Dr. Modlik also assessed Whitlow's emotional functioning, remarking that Whitlow's "range of affects was within normal limits" because Whitlow smiled, grinned, and laughed at various times and did not appear to be in any kind of distress.  *Id.*  In addition, Dr. Modlik saw no signs of a thought disorder and remarked on the numerous inconsistencies in Whitlow's self-reports.  *Id.*  He

opined that Whitlow was not "in any psychotic" and instead appeared to be "an individual of generally borderline intelligence with a long history of alcohol and drug abuse, and probably with rather sociopathic personality traits. *Id.* He also did not find Whitlow to be overly credible and noted that other professionals had noted the same thing. *Id.* Based on his observations, Dr. Modlik diagnosed Whitlow with alcohol and cocaine dependence, malingering, borderline intellectual functioning, and antisocial personality disorder. *Id.* He assigned a current global assessment functioning ("GAF") score of 60, which is indicative of symptoms of moderate difficulty in social, occupational, or school functioning. *Id.* Finally, Dr. Modlik concluded that Whitlow could handle his own funds but warned that those funds would likely be used to sustain a chemical dependency. *Id.*

Shortly thereafter, on October 28, 2005, Whitlow reported to Midtown that he had been drinking daily to help himself sleep and to help with depression. R. at 89. At that time, he indicated that he wanted to stop drinking. *Id.* About a week and a half later, Whitlow reported that he felt much better when he took his medication, no longer had hallucinations, was better able to handles stresses, and denied any depressive symptoms. R. at 91. At that time, the doctor observed no delusions or suicidal or homicidal ideation but did note Whitlow's blunted affect and some decreased concentration. *Id.* The doctor ordered Whitlow to continue using his medication. *Id.*

About a month later, on December 1, 2005, state agency psychologist J. Pressner reviewed Whitlow's record and opined that Whitlow did not have a severe mental impairment, citing as support the opinion of Dr. Modlik. R. at 206-19. As part of his review, Dr. Pressner requested and received additional evidence from an interview that was conducted with Whitlow's sister about Whitlow's daily activities and concentration. R. at 151-53, 222. She reported that as long as

Whitlow took his medication he did not exhibit angry behavior, that he walks long distances and sometimes utilizes cabs and the city bus system, and purchases groceries and personal items on his own.  R. at 151.  He was also able to perform a variety of household chores and could prepare food without having to read the food preparation directions.  R. at 152.  Finally, she indicated that Whitlow was able to maintain appropriate hygiene and grooming and fix household objects for family members and friends.  R. at 153.

Subsequently, on March 23, 2006, Whitlow went to the emergency room at Wishard for complaints of ear pain and cough.  R. at 174.  At that time, he reported that he had last drunk alcohol one month before.  *Id.*  About a week and a half later, he met with his caseworker at Midtown for the first time since November 2005 after having missed appointments.  R. at 91, 93, 179-87. Whitlow reported that he had been having blackouts on a daily basis and had consumed a fifth of gin the night before.  R. at 93.  After he stated that he was staying with different people every night, his caseworker advised him to follow up with a shelter called Horizon House.  R. at 93, 172, 191.

About two weeks later, on April 19, 2006, Whitlow met with Dr. Nancy Butler ("Dr. Butler") at Midtown.  R. at 194.  He sought a refill for his medication and reported that since running out of his medication he had been depressed, experiencing mood swings, and having hallucinations.  *Id.* Dr. Butler noted diagnoses of schizoaffective disorder, alcohol dependence, cocaine abuse, personality disorder not otherwise specified, and mild mental retardation.  *Id.*  She also assigned a GAF score of 45, which is indicative of serious impairment in social, occupational, or school functioning.  *Id.*  She also gave him a prescription to refill his medication.

Whitlow returned to Midtown on April 19, 2005, and reported that he had experienced more depressive symptoms in the past month, had consumed alcohol on April 16, and that he wanted to

7

stop drinking.  R. at 94, 196.  The next day, he reported that he had been sober for five months.  R. at 95, 197.  At the time, he appeared to guarded and slow in processing information but displayed no signs of delusions or suicidal or homicidal ideations.  *Id.*  However, Whitlow's dosage on his medication was increased at that time and again on May 8, 2006.  R. at 95, 199.

In July 2006, state agency psychiatrist B.R. Horton affirmed Dr. Pressner's opinion that Whitlow had no severe mental impairment.  R. at 206.  In addition, state agency physician J. Corcoran affirmed Dr. Ruiz's opinion that Whitlow could perform light exertional work.  R. at 279.

In September 2006, Whitlow reported that he was feeling better and was not as depressed.  R. at 105.  He was also taking his medication at the time.  R. at 195.  However, he continued to consume alcohol, reporting that he had been drinking a few weeks before while staying in an abandoned house with other people.  R. at 105.  At the end of September, he expressed that he was doing better with his medication but denied any drug or alcohol use.  R. at 106.  At that time, his affect was blunted, he was alert and had appropriate grooming, was calm, and denied hallucinations and suicidal or homicidal ideations.  *Id.*  However, on October 9, 2006, Whitlow stated that he was having auditory hallucinations.  R. at 107.


## C.  TESTIMONY AT THE HEARING

On December 7, 2006, the ALJ held a hearing on Whitlow's case.  Whitlow testified that he did not read and write well and had taken special education classes while in school.  R. at 390.  He stated that he had hallucinations even if he took his medicine although not to the extent that he did when he was not taking his medicine.  R. at 391.  He admitted that he had tried to commit suicide

and kill other people and that he had just been in the hospital for twenty-four hours because his medication dosages were not high enough.  R. at 392-93.

In addition, Whitlow testified that he had gout and that his feet hurt and swelled after walking a long distance or if he stood too long.  R. at 393.  Whitlow claimed that he could only stand for about fifteen minutes and walk about half a block, and he noted that he used a cane when his feet swelled badly.  R. at 394, 404.  He also complained about lower back pain and reported that he only could lift about five pounds.  R. at 394.  He stated that sitting for fifteen minutes hurt his spine and indicated that his hands were arthritic and swelled.  R. at 395.  Further, Whitlow asserted that he had asthma and bronchitis and used an inhaler.  R. at 396.  Finally, Whitlow claimed to have been sober for about eighteen months, but he admitted that the week before he had consumed a pint of wine. R. at 406, 410.

During the hearing, the ALJ also heard testimony from a vocational expert ("VE").  The ALJ asked the VE to consider a hypothetical person of Whitlow's age, education, and work experience with the capability of carrying twenty pounds occasionally and ten pounds frequently, standing and walking for about six hours a day, sitting for about six hours a day, occasionally performing certain postural activities, performing simple and repetitive work, and having only superficial interaction with others.  R. at 414.  The VE responded that such an individual could perform light, unskilled work as a housekeeping cleaner, dishwasher, and food preparation worker.  *Id.*  The ALJ also asked the VE to consider a hypothetical individual who could lift and carry ten pounds occasionally and five pounds frequently, could stand for two to eight hours and sit for six hours a day, and had the same non-exertional limitations as in the first hypothetical.  *Id.*  The VE opined that such a person

could perform sedentary, unskilled jobs of production worker, hand packager, and production inspector. *Id.*

## II.  DISABILITY AND THE STANDARD OF REVIEW

To be eligible for DIB, a claimant must have a disability under 42 U.S.C. § 423.[1] "Disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  In determining whether a claimant is disabled, an ALJ applies the five-step process set forth in 20 C.F.R. § 404.1520(a)(4):

1.  Is the claimant engaging in substantial gainful activity?  If so, he is not disabled.

2.  If not, does the claimant have an impairment or combination of impairments that are severe?  If not, he is not disabled.

3.  If so, does the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If so, the claimant is disabled.

4.  If not, can the claimant do his past relevant work?  If so, he is not disabled.

5.  If not, can the claimant perform other work given his residual functional capacity ("RFC"), age, education, and experience?  If so, then he is not disabled.  If not, he is disabled.

The burden of proof is on the claimant for the first four steps and then shifts to the Commissioner at the fifth step. *See Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

---

[1]  Whitlow applied for both DIB and SSI.  Because the definition of "disability" and the applicable five-step process are identical under both standards, reference will only be made to the standards for DIB.

In addition to the foregoing, "an individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U .S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J). The regulations address how an ALJ should determine whether substance addiction is a contributing factor material to a finding of disability. *See* 20 C.F.R. § 404.1535. The ultimate question for the ALJ to determine is whether a claimant would still be disabled if he stopped using drugs and alcohol. *See id.*

The Social Security Act, specifically 42 U.S.C. § 405(g), provides for judicial review of the Commissioner's denial of benefits. When the Appeals Council denies review of the ALJ's findings, the ALJ's findings become the findings of the Commissioner. *See, e.g.*, *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999). This Court will sustain the ALJ's findings if they are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999). In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ. *See id.* While a scintilla of evidence is insufficient to support the ALJ's findings, the only evidence required is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

In addition, the ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). "An ALJ may not discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the [Court] to trace

11

the path of his reasoning." *Diaz*, 55 F.3d at 307.  In other words, the ALJ must clearly articulate his analysis of the evidence, building an accurate and logical bridge from the evidence to his conclusion. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002); *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).  An ALJ's articulation of his analysis "aids [the Court] in [its] review of whether the ALJ's decision was supported by substantial evidence."  *Scott v. Heckler*, 768 F.2d 172, 179 (7th Cir. 1985).

### III.  DISCUSSION

### A.  THE ALJ'S DECISION AND WHITLOW'S ARGUMENTS FOR REVERSAL

In analyzing Whitlow's case, the ALJ noted the five-step sequential evaluation process for determining whether Whitlow was disabled.  R. at 17-31.  At step one, the ALJ concluded that Whitlow had not engaged in substantial gainful activity since his alleged onset date of October 1, 2004.  R. at 19.  At step two, the ALJ found that Whitlow had severed impairments of osteoarthritis, alcohol abuse and dependence, cocaine abuse and dependence, an organic mental disorder of borderline intellectual functioning, a personality disorder, and a history of schizoaffective disorder. *Id.*  At step three, the ALJ concluded that Whitlow met Listing 12.09 for drug addiction and/or alcoholism as analyzed under 12.02 (organic mental disorders), 12.08 (personality disorders), and 12.04 (affective disorders), all as provided by 20 C.F.R. Part 404, Subpart P, Appendix 1.  R. at 19-21.  Specfically, the ALJ found that Whitlow, when abusing substances, had moderate limitations

in daily activities; marked limitations in social functioning, concentration, persistence, and pace; and that he was in one long, extended period of decompensation. *Id.*[2]

Notwithstanding the limitations, the ALJ determined that if Whitlow stopped abusing substances he would not have an impairment that met or medically equaled any of the impairments in the listings. R. at 21-26.  The ALJ concluded that Whitlow retained the ability to perform light exertional work provided that he avoided moderate exposure to unprotected heights and dangerous machinery, performed simple and repetitive work, and had no more than superficial interaction with other individuals.  R. at 26-29.  Because of the lack of any work that qualified as "past relevant work" under step four, the ALJ addressed whether Whitlow could perform any other work in the national economy.  R. at 29-30.  Based on the VE's testimony, the ALJ found at step five that Whitlow could perform other jobs existing in a significant number in the national economy.  *Id.* Therefore, the ALJ ruled that Whitlow was not disabled.  R. at 30-31.  The Appeals Council affirmed the ALJ's decision on July 16, 2007, making the ALJ's findings the findings of the Commissioner.  R. at 4-7.

Whitlow raises several arguments in support of his request to reverse the denial of benefits, which the Court has attempted to reorganize into three main issues.  First, as an overarching issue, Whitlow challenges whether there is substantial evidence to support the ALJ's determination that he did not meet or medically equal the listings for various mental ailments or impairments because of alcohol and substance abuse.  In making this argument, Whitlow contends *inter alia* that the ALJ ALJ erred by failing to call a medical expert and that the ALJ ignored and rejected controlling

---

[2]  The ALJ also found that Whitlow did not meet Listing 12.05(C) for mental retardation because he failed to establish deficits in adaptive functioning before twenty-two years of age.  R. at 21-23.

13

evidence that demonstrated that he met or medically equaled a listed impairment. Thus, Whitlow accuses the ALJ of effectively "playing doctor."

Whitlow's second main issue is that the ALJ failed to properly evaluate his credibility. Whitlow contends that the ALJ's findings are contrary to evidence in the record that was ignored and rejected and contrary to Social Security Ruling 96-7p which provides for consideration of an individual's subjective complaints about the intensity and persistence of pain or other symptoms.

Third, Whitlow asserts that the ALJ's RFC assessment of light exertional work is erroneous. Whitlow argues that the RFC determination is incomplete because it fails to take into consideration the limitations caused by severe mental illnesses and chronic back and feet pain. Whitlow alleges that the ALJ ignored such evidence, thereby failing to give full consideration to all of his documented impairments.

Finally, Whitlow contends that the ALJ's decision not to reopen the prior cessation decision is erroneous. More particularly, Whitlow claims that this decision violates due process because the ALJ ignored evidence that demonstrated disability.

## B.  WHETHER SUBSTANTIAL EVIDENCE SUPPORTS THE ALJ'S DECISION

Whitlow challenges the ALJ's conclusion that he did not meet or medically equal the listings for his various mental ailments and impairments because of alcohol and substance abuse. As the claimant, Whitlow bears the burden of proving that his condition meets or equals a listed impairment. *See Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). In order to meet that burden, he must show that he satisfies all of the criteria of a listed impairment. *See id.*

Although he claims that the ALJ's decision was erroneous, Whitlow fails to discuss the evidence he alleges supports a finding of disability.  He simply refers to the standards and cites to a large number of pages that he believes were overlooked, all without providing any analysis or context explaining how the evidence supports his position.  As the Commissioner notes, Whitlow has essentially waived for review his arguments.  *See, e.g.*, *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

Notwithstanding the waiver, Whitlow's contention that the ALJ ignored evidence does not carry the day for him.  It is well-established that an ALJ is not required to explicitly address every piece of evidence in the record as long as he provides "some glimpse into [his] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001).  *See also Carlson,* 999 F.2d at 181.  Further, the evidence that the ALJ did not expressly note and that Whitlow believes was ignored predated the alleged onset date by more than seven years.  Thus, although it is not clear that the evidence was ignored, the ALJ was not bound to develop the record that far back.  *See, e.g.*, *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003).  Finally, to the extent that there may be evidence in the record that would support Whitlow's argument, at best it would merely conflict with the other medical evidence upon which the ALJ relied, a conflict that the ALJ was empowered to resolve.  *See Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the . . . ALJ.").

Moreover, Whitlow's argument that the ALJ should have obtained an opinion of a medical expert fails.  How much evidence to gather is a subject left to the ALJ's discretion as long as the ALJ follows the proper procedures and adequately develops the record..  *See Flener ex rel. Flener*

*v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004); *Kendrick v. Sec'y of Health & Human Servs.*, 998 F.2d 455, 458 (7th Cir. 1993). The Court discerns no such error in that respect with this case. Moreover, the ALJ had available to him the opinions from the state psychologists, which were based in part on Dr. Modlik's findings, and numerous mental health treatment notes that the ALJ reviewed in detail. Consequently, the Court rejects Whitlow's allegation that the ALJ should have obtained a medical expert and chose to "play doctor."

In any event, the ALJ properly considered the evidence regarding Whitlow's mental impairments, including his claim of mental retardation. R. at 19-26. He also considered the opinions from the state agency psychologists, who relied on Dr. Modlik's assessment to explicitly address the listings and concluded that Whitlow did not have severe impairments. R. at 24-26, 206-19, 263-69. Instead, they opined that Whitlow had mild mental limitations, something that the ALJ accepted in his decision. R. at 24-25.

In addition, the ALJ went through a thorough review of the record to address the claim that Whitlow met or equaled Listing 12.05(C) for mental retardation. The ALJ ultimately concluded that Whitlow did not meet the listing because he could not meet the requirement for deficits in adaptive functioning prior to twenty-two years of age. R. at 22-23. In particular, the ALJ noted the absence of anything in Whitlow's school records to substantiate the claim that Whitlow had taken special education classes and the lack of any evidence to indicate a deficit in adaptive functioning. R. at 22, 334. Further, the Court notes that the report from Dr. Modlik suggests that Whitlow does have some adaptive functioning and is able to perform such activities as independently managing his own funds. R. at 263-69. Indeed, it is the presence of Dr. Modlik's findings in this case, along with a lack of clear evidence that Whitlow actually took special education classes, that distinguish this case

16

from the circumstances in the unpublished opinion of *King v. Barnhart*, No. 1:06-cv-381-DFH-TAB, 2007 WL 968746, *3 (S.D. Ind. Feb. 26, 2007), a case upon which Whitlow strongly relies. The Court finds that Whitlow failed to bear his burden of showing deficits in adaptive functioning, and so he failed to establish that he met Listing 12.05(C). Therefore, the Court will uphold the ALJ's treatment of the claim of mental retardation. *See Mayes v. Astrue*, No. 1:070-cv-193-DFH-TAB, 2008 WL 126691, *6 (S.D. Ind. Jan. 10, 2008) (concluding that record supported ALJ's determination that claimant failed to provide evidence of deficits in adaptive functioning).

As a final matter, the Court addresses Whitlow's concern that the ALJ failed to follow the proper procedures for consideration of Whitlow's drug abuse and alcoholism. Like Whitlow's other arguments, this argument does not warrant reversal. The ALJ noted the proper standard in his decision. R. at 18-19. He then considered whether Whitlow's impairments singly and in combination, including the addiction, met a listing and concluded that Whitlow did meet the requirements of various listings. R. at 19-21. Thus, the ultimate question posed under the circumstances was whether Whitlow would still be considered disabled if he stopped using drugs and alcohol. *See* 20 C.F.R. § 404.1535; *Kangail v. Barnhart*, 454 F.3d 627, 628 (7th Cir. 2006). To address the issue, the ALJ went through a lengthy and detailed explanation, reviewing treatment notes and the various medical and consultative opinions in the record. R. at 21-26. These materials constitute substantial evidence in support of the ALJ's conclusion and allow the Court to "trace the path of [the ALJ's] reasoning." *Diaz*, 55 F.3d at 307. Nothing more was required.

## C.  THE ALJ'S CREDIBILITY DETERMINATION

In order to evaluate the intensity and persistence of symptoms, the ALJ was required to consider objective medical evidence as well as subjective factors, which include such things as a claimant's daily activities, his subjective reports of the nature of his symptoms, the type and effectiveness of medications, and evidence from treating physicians regarding functional limitations. *See* 20 C.F.R. § 404.1529(c)(3)-(4); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).  The ALJ may also consider inconsistencies in the record and whether a claimant's testimony conflicts with the rest of the evidence.  *See* 20 C.F.R. § 404.1529(c)(4).  When reviewing an ALJ's credibility determination, the Court will not reweigh the evidence or decide questions of credibility anew.  *See Nelson*, 131 F.3d at 1234.  Nevertheless, the Court will reverse a credibility determination if the ALJ fails to give specific reasons for the finding that are supported by the record.  *See Brindisi ex el. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003).

Here, Whitlow claims that the ALJ failed to apply the factors for considering credibility as mandated by the regulations.  Specifically, Whitlow cites to Social Security Ruling 96-7p.  Quoting from part of the ALJ's decision, he suggests that the ALJ just relied on objective medical evidence in rendering his credibility determination.  Further, Whitlow once again asserts that the ALJ ignored evidence.  Finally, he attempts to explain his inconsistent reporting by speculating that it was the result of his mental condition.

Whitlow's arguments are unpersuasive.  First, a review of the decision reveals that the ALJ was well-aware of the requirements for determining credibility, directly citing the ruling and factors that Whitlow erroneously contends were overlooked.  R. at 26-27.  Moreover, contrary to Whitlow's suggestion, the ALJ did not say that he considered only the objective medical evidence; he

18

specifically stated that he had considered the objective medical evidence "and other evidence" as required by the regulations.  R. at 26.  The ALJ then proceeded to analyze the seven factors listed in Social Security Ruling 76-7p, addressing such things Whitlow's daily activities as they were self-reported and comparing them to the account provided by Whitlow's sister.  R. at 27-29.  The ALJ also reviewed *inter alia* Whitlow's treatment history, his medication usage, and inconsistencies in Whitlow's self-reports on alcohol use.  *Id.*

Whitlow neglects to explain precisely what evidence the ALJ ignored.  Based on Court's review of the record, the Court concludes that the ALJ's credibility determination was both thorough and detailed.  Whitlow has failed to demonstrate that the determination was patently wrong.  *See Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003).  Therefore, he cannot prevail on this issue.

### D.  THE ALJ'S RFC DETERMINATION

Social Security regulations mandate that a claimant's RFC be "based on all of the relevant medical and other evidence."  20 C.F.R. § 404.1545(a)(3).  Here, Whitlow contends that the ALJ's RFC determination of light exertional work should be set aside because the ALJ ignored evidence of mental impairments and his sometimes unpredictable and violent behavior.  Whitlow also alleges that the ALJ failed to consider evidence of his foot and back pain and failed to cite to and describe all of the medical evidence that supported the RFC determination.

In making his argument, Whitlow fails to explain how the RFC determination was deficient.  The record reveals that the ALJ reviewed the treatment notes and relied on clinical records for his RFC determination.  R. at 24-25, 28-29.  The ALJ considered Whitlow's mental limitations and cited his reasons for finding such limitations.  R. at 29.  He specifically indicated that he gave moderate

weight to the state agency psychologists, who identified mild limitations, and further noted Whitlow's borderline intellectual functioning, schizoaffective disorder, and personality disorder. *Id.* Based on the borderline intellectual functioning, the ALJ limited Whitlow to simple and repetitive work. R. at 26. In addition, the ALJ took into consideration Whitlow's difficulty with relating to other individuals and his tendency to sometimes become irritable and hostile. *Id.* As such, he limited Whitlow to only superficial contact with others. R. at 26, 29.

Moreover, the ALJ discussed Whitlow's claims of back and foot pain. R. at 27-28. He explicitly indicated that his RFC determination was based on the opinions of the state agency doctors, who had in turn relied upon the findings and observations of the consultative physician that Whitlow had mild limitations in walking. R. at 28, 272-79, 282.

Based on the foregoing, Whitlow has failed to demonstrate any error with respect to the ALJ's RFC determination. Contrary to Whitlow's arguments, the ALJ did consider Whitlow's mental impairments, his unpredictable and violent behavior, and his foot and back pain. Furthermore, Whitlow has not directed the Court's attention to any evidence that would support a greater RFC determination. Therefore, the Court declines to set aside the ALJ's RFC determination.

**E.  THE ALJ'S DECISION TO DECLINE TO REOPEN THE CESSATION DECISION**

At the administrative hearing, Whitlow requested that the ALJ reopen the medical cessation decision on his prior receipt of disability benefits. R. at 16, 388. An ALJ has the discretion to reopen a claim within four years of an initial denial. *See* 20 C.F.R. §§ 404.987-404.989. Thus, as the ALJ found, Whitlow's request was timely. R. at 16. Nonetheless, the ALJ declined to reopen the decision, finding that there was "no good cause" to do so. *Id.* Absent a constitutional issue, the

20

ALJ's decision not to reopen the prior case is not reviewable by this Court. *See Califano v. Sanders*, 99, 107-09 (1977).

In challenging this decision, Whitlow claims that the ALJ violated due process by failing to consider all of the evidence, but he offers little beyond speculation and a cursory assertion that the evidence proves he is disabled. Moreover, even if the ALJ had reopened the prior case, he would likely have been required to consider the effect of Whitow's alcohol and substance abuse, which he concluded was a contributing factor and rendered Whitlow ineligible for benefits. *See, e.g.*, *Brown v. Apfel*, 192 F.3d 492, 496-97 (5th Cir. 1999) (concluding that retroactive application of Contract with America Advancement Act was not unconstitutional, in part because of lack of contractual right to receive benefits). Thus, reopening the prior case would not have changed the outcome. In any event, the Court concludes that there is no constitutional issue in this case; as already explained, there is substantial evidence in the record to support all aspects of the ALJ's decision. Therefore, the Court will not disturb the ALJ's decision not to reopen the prior case.

## IV.  <u>CONCLUSION</u>

For all of the foregoing reasons, the final decision of the Commissioner of Social Security

in this case is **AFFIRMED**.  Final judgment shall be entered accordingly.

IT IS SO ORDERED: 03/10/2009

_William T Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

**Electronically distributed to:**

Patrick H. Mulvany                              Thomas E. Kieper
mulvany@onet.net                                OFFICE OF THE UNITED STATES ATTORNEY
                                                tom.kieper@usdoj.gov